DECISION
{¶ 1} Relator, Timmerman Truss, Incorporated, has filed an original action in mandamus requesting this court to issue a writ of mandamus to order respondent, Industrial Commission of Ohio, to vacate its order that granted compensation, pursuant to R.C. 4123.57(B), to respondent-claimant, Chad Wagner, for the loss of his right hand and to issue a new order denying such compensation.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Section (M), Loc.R. 12 of the Tenth District Court of Appeals, who rendered a decision including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate decided that the matter should be remanded to the commission with instructions to issue an order that meets the requirements of State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. Claimant has filed objections to the magistrate's decision.
 {¶ 3} In his objections, claimant repeats those arguments relating to the reports of Drs. Bamberger and Gibson, that were considered but rejected by the magistrate. The magistrate found that the language of the application for compensation, coupled with the commission's order made it unclear whether the commission was intending to rely on the provision relating to a loss of a hand or the loss of use of two or more fingers, which cause a greater disability/handicap than is ordinarily experienced.
 {¶ 4} Upon a review of the magistrate's decision and an independent review of the file, this court adopts the magistrate's decision as its own and claimant's objections are overruled. Therefore, this court issues a writ of mandamus to order respondent, Industrial Commission of Ohio, to vacate its order that granted compensation to claimant, Chad Wagner, pursuant to R.C. 4123.57(B), and to issue a new order that grants or denies such compensation and that meets the requirements of Noll.
Objections overruled, writ of mandamus granted.
BROWN and KLATT, JJ., concur.
 IN MANDAMUS {¶ 5} In this original action in mandamus, relator, Timmerman Truss, Inc., asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order granting compensation under R.C. 4123.57(B) to respondent Chad Wagner for the loss of his right hand and to issue a new order denying that compensation.
Findings of Fact:
 {¶ 6} 1. In September 1999, Chad Wagner ("claimant") sustained a work-related injury to the fingers and thumb of his right hand, and his workers' compensation claim was allowed for multiple conditions of the fingers and thumb.
 {¶ 7} 2. Claimant underwent numerous surgeries in 1998 and 1999 to treat his allowed conditions. For example, on the date of injury, the surgeon described the arterial and nerve repair to the index and middle ("long") fingers, and also observed that there were lacerations to the thumb and ring finger.
 {¶ 8} 3. On February 8, 1999, claimant's attending physician, H. Brent Bamberger, D.O., stated in office notes that claimant would be returning to light-duty work in March and would be seen in two to three months for a follow-up.
 {¶ 9} 4. On May 3, 1999, Dr. Bamberger noted that claimant could not use the proximal interphalangeal joint of his index finger. Dr. Bamberger also noted that the vascular flow to the middle finger had not been adequately restored by surgery, and he recommended amputation of that entire finger, referred to as a "ray resection," rather than attempting further reconstructive surgery.
 {¶ 10} 5. In September 1999, the middle finger was amputated.
 {¶ 11} 6. On October 28, 1999, Dr. Bamberger's office notes state: "Pt. asked when could he return to work. Per HBB can return now. Spoke w/pt. made aware pt going back to work on 11/4/99."
 {¶ 12} 7. On November 11, 1999, Dr. Bamberger reported that claimant "is doing well." He did not order a follow-up, stating that claimant could be seen as needed.
 {¶ 13} 8. On April 27, 2000, Dr. Bamberger reported that claimant had fractured his ring finger in a fight on April 23, 2000. The doctor was hoping to treat the fracture non-operatively with a cast, but he felt that an open reduction and internal fixation might be necessary.
 {¶ 14} 9. Dr. Bamberger later determined that the fracture required surgery, and, on May 10, 2000, an open reduction and internal fixation was performed on the ring finger. On June 15, 2000, Dr. Bamberger reported that claimant was doing well although he had some discomfort when using a hammer with the right hand.
 {¶ 15} 10. On June 15, 2000, Dr. Bamberger noted that claimant had good healing from the recent surgery and was to continue with light-duty work. (The parties dispute, however, whether claimant continued on light duty or eventually returned to the full range of duties.)
 {¶ 16} 11. In December 2001, claimant filed an application for compensation under R.C. 4123.57(B).
 {¶ 17} 12. A file review was performed on March 11, 2002, by Dr. Gibson, who opined as follows:
 {¶ 18} "Mr. Wagner sustained a very severe multiple finger laceration injury in September of 1998.
 {¶ 19} "He has undergone multiple surgeries (mostly in an attempt to save the middle finger). He, however, had the middle finger amputated, and has Kerchner wires and ankylosis of other joints of the fingers, which, in effect, renders this hand as useless, for functional purposes.
 {¶ 20} "He has lost thumb/index finger opposition (pinch-point) and the combination of neurosensory loss, plus neuromotor loss and ankylosis, allows for the conclusion that Mr. Wagner has lost the use of his right hand. His dexterity and functional capacity are near zero and the record clearly shows a loss of use has taken place regarding the right hand.
 {¶ 21} "Based on medical documentation in the file there is sufficient evidence to support a loss of use of the right hand as being causally related to the 9-23-98 injury of record. Permanent partial percentage must be evaluated by way of C-92 examination.
 {¶ 22} "ADDENDUM:
 {¶ 23} "Mr. Wagner now has a total loss of use of the entire right hand as a direct result of his 9-23-98 injury of record. This Addendum is for the purposes of clarity."
 {¶ 24} 13. The Ohio Bureau of Workers' Compensation granted compensation for "100% LOSS OF USE of the RIGHT HAND."
 {¶ 25} 14. One of claimant's co-workers, Tim Price, reported as follows:
 {¶ 26} "I have been an employee of Timmerman Truss INC, for almost thirteen years now, and have been around Chad since he became an employee. I don't work side by side with him, but do pass through the barn he works in several times a day.
 {¶ 27} "After coming back from his second surgery I can remember him being dependent on his uninjured hand. This was understandable d[ue] to the severity of his injury. Through his therapy and a matter of time he began using his hand more and more everyday. I believe he has regained close to a hundred percent use of his hand now. Granted, he is missing one of his fingers now, but by watching him work you wouldn't know it."
 {¶ 28} 15. Another worker, Bob Weeks, reported as follows:
 {¶ 29} "My name is Bob Weeks, and I have worked for Timmerman Truss Inc. for almost 12 years. For about the last 3 to 4 years I have worked with Chad Wagner. I was working there when he first injured his right hand, and continued to work with him when he returned to work. In the time since his return to work, he has become a very productive worker. As far as how he does with his right hand while at work, he does exactly the same work that everyone else does, and uses both hands just like he did before the injury. He doesn't have any trouble with using a hammer or grasping boards or for that matter anything you would normally do with your hands.
 {¶ 30} "I have also had some outside of work experiences with Chad. Last summer, 2001, I played basketball with Chad at the park. He played just like anybody else that was there, he used his right hand to shoot and dribble, pass, catch, whatever his instincts let him do. He never had any noticeable pain or discomfort and he never complained that his hand bothered him.
 {¶ 31} "On another occasion, Chad and myself and a couple of other people went to the lake on Labor Day 2001. While at the lake he did the same things everybody else did, water-ski, tubing, swimming, and everything he did, he did as normal as anybody else. He could grab the ski rope, he could pull himself up onto the tubes, he could hold onto the tubes, he could climb the ladder back into the boat. Unless you looked directly at his right hand, and noticed he only had four fingers, you would never know by the way he uses his hands, that he was ever injured."
 {¶ 32} 16. On April 3, 2002, Eric Barga reported:
 {¶ 33} "* * * I have worked with Chad Wagner for about three years now. While working with Chad, there has never been a time he could not `physically' do the things that I do at work. For instance, he is able to grasp and swing a hammer. He can also pick up boards and truss plates, all with his right hand. While watching him do these things, I have never seen any visible discomfort, nor have I heard him complain about any discomfort in his right hand while at work.
 {¶ 34} "Outside of work, we have played basketball. While playing, he can shoot and pass, again without visible discomfort or complaining that it bothered him.
 {¶ 35} "Even though his hands do not look the same, he is still able to do all tasks, at work, that are asked of him to perform. Furthermore, the tasks he is required to perform do not differ from that of any other employee."
 {¶ 36} 17. On April 2, 2002, Brad Westover stated:
 {¶ 37} "Chad has the ability to use both hands with no handicap. I've known [C]had for about 4 years now. Currently he plays golf, swims, volleyball, basketball, and plays video games. At work he uses a hammer, picks up boards, carry things, [and] writes with no limitations. So he should claim only 10% disability, if that. Not the 100% which he wants."
 {¶ 38} 18. Another co-worker, Bret Thompson, reported:
 {¶ 39} "In my opinion, Chad has full use of his hand. When Chads [sic] at work he does the same thing that someone else would be doing. He hammers plates and pounds nails why'll [sic] using his hand. With the had he grabs boards and carries the[m] around like he never had a problem with it. Out of the work place he can use a computer with no problems. So I think Chad still has a lot of use of his four fingered hand."
 {¶ 40} 19. Chris Harshberger reported:
 {¶ 41} "I have worked with Chad Wagner for the last two and a half years. I have also went boating with him. From what I can see he has no problem doing everything I can do with his right or left hand. He doesn't complain about pain. He is still able to swing his hammer at work. I feel he has at least 97% percent use of his hand."
 {¶ 42} 20. On April 22, 2002, Dr. Bamberger provided a report. The first paragraph identifies the industrial injury and provides the list of allowed conditions. The second paragraph is a list of the surgeries, including the open reduction and internal fixation on the ring finger fractured in the fight. The third paragraph provides his discussion and opinion:
 {¶ 43} "This was a significant injury and it is my opinion Chad would qualify for a loss of use of the right hand. He is right-hand dominant and his employment at the time of injury involved physical labor. Based on his injury, his employment history, and the fact that this is his dominant hand, I would concur with the loss of use opinion issued by the BWC."
 {¶ 44} 21. In May 2002, claimant was examined by Ron M. Koppenhoefer, M.D. Claimant reported to Dr. Koppenhoefer that his surgery in 2000 was performed when he broke his hand in a fight/argument with his brother, and that the rod was still present in the ring finger from that surgery. Claimant reported that the right hand turned cold and slightly bluish when temperatures were at 35-40 degrees although a glove helped the problem. Claimant further reported that "he is able to work in construction and do labor activities," although claimant noted that he had decreased strength of the right hand and some difficulty gripping. After a hard day's work, particularly when he was doing hammering with his right hand, the hand would be sore.
 {¶ 45} Examination revealed that the thumb had full range of motion but slightly decreased sensation, and the thumb nail was unremarkable. As to the right index finger, the MP joint had full motion but the PIP joint was fused, and the DIP joint had very little motion. Sensation of the index finger was normal. The middle finger was absent. The ring finger showed the surgery and had decreased sensation. The little finger had full motion at the MP and PIP joints but limited motion at the DIP joint. Grip strength of the right hand was 30 kilograms compared to left-hand grip of 42 kilograms. The right hand was well callused.
 {¶ 46} Dr. Koppenhoefer concluded that claimant had documented limitations of his right hand but that there was no indication that he had sustained a total loss of function of the right hand. He indicated that he had been provided with videotapes of claimant at work, using his right hand, and engaged in sports.
 {¶ 47} 22. In June 2002, a district hearing officer denied the application:
 {¶ 48} "It is the finding of the District Hearing Officer that the claimant did not suffer or sustain a 100% loss of use of right hand due to amputation.
 {¶ 49} "This finding and order is based upon the independent medical report of Dr. Koppenhoefer, dated 05/03/2002, as well as upon the medical report of Dr. Bamberger, dated 11/04/1999, releasing the claimant to return to his `usual duties' with `no restrictions.' "
 {¶ 50} 23. On September 5, 2002, Dr. Bamberger's notes state that claimant had right hand pain, "slight decreased grip strength," no motion at the PIP joint of the index finger, and amputation of the middle finger. X-rays showed amputation of the middle/long finger of the right hand and surgical hardware at the ring finger. On an accompanying drawing, Dr. Bamberger showed that the right index finger was fused at the PIP joint, that the middle finger was gone, and that the ring finger had been fractured and repaired with internal hardware.
 {¶ 51} 24. On September 13, 2002, a staff hearing officer granted the application:
 {¶ 52} "It is the finding of the Staff Hearing Officer that they [sic] injured worker did sustain a 100% loss of use of his right hand as a result of the 9-23-98, industrial injury. Therefore, the claimant's C-86 motion filed 2-15-02, is granted. Compensation pursuant to O.R.C.5123.57 [sic] is ordered for a perio[d] of 175 weeks.
 {¶ 53} "This order is based upon the medical reports of Dr. Gibson (3-11-02 and 3-18-02) and Dr. Bamberger (4-22-02)."
 {¶ 54} 25. Further appeal was refused.
Conclusions of Law:
 {¶ 55} Relator argues that the commission abused its discretion in granting compensation for loss of the right hand. The magistrate agrees. Dr. Bamberger's narrative report of April 22, 2000, on which the commission relied, does not constitute some evidence on which the commission may rely, nor can the file review of Dr. Gibson sustain the award.
 {¶ 56} R.C. 4123.57(B) provides that 175 weeks of compensation shall be paid to a claimant for "the loss of a hand." The statute does not distinguish between the dominant and non-dominant hands with regard to the compensation that is awarded, nor is the type of employment relevant. The injured worker is compensated for the loss of a hand regardless of whether it was the right or left and regardless of whether he used the hand in his work.
 {¶ 57} In contrast, a claimant seeking temporary total compensation must show that the injury prevented him from performing his former position of employment, and, therefore, the employment history is crucial. A physician opining as to temporary total disability must indicate awareness of the claimant's employment at the time of the injury. State ex rel. Clark v. Indus. Comm. (1995), 72 Ohio St.3d 377. Claimants seeking permanent total compensation must show not only that they cannot return to the former employment but that they cannot perform any other kind of employment; therefore, the fact that an injury caused impairment of the dominant hand would be a crucial fact, as would the fact that the worker had used his hands working as a laborer. See, generally, State ex rel. Stephenson v. Indus. Comm. (1987),31 Ohio St.3d 167; State ex rel. Quarto Mining Co. v. Foreman (1997),79 Ohio St.3d 78.
 {¶ 58} It is important to note that, to receive an award for the loss of a hand under R.C. 4123.57(B), claimants are not required to demonstrate that the hand has been severed or amputated. See, e.g., State ex rel. Walker v. Indus. Comm. (1979), 58 Ohio St.2d 402. Rather, the claimant may obtain the award upon proving loss of use of the body part as though it had been amputated. Id. In the present case, because the hand was largely intact, it was necessary for claimant to show that he had essentially lost the use of the hand.
 {¶ 59} In the present case, the commission granted 175 weeks of compensation, based on a finding that claimant sustained a "100% LOSS OF USE RIGHT HAND" as a result of the industrial injury. As stated above, the magistrate concludes that this finding was not supported by evidence on which the commission could lawfully rely.
 {¶ 60} Dr. Bamberger's report of April 22, 2002, does not constitute some evidence on which the commission may rely for several distinct reasons. First, his language demonstrates that he incorrectly defined what it meant to qualify for an award for the loss of a hand. He did not say that claimant had lost the use of his hand for all practical, functional purposes. Instead, he opined that claimant had sustained a "significant" injury to the hand and qualified for an award for the loss of his hand because he was right-hand dominant and was employed doing physical labor at the time of injury. Nowhere does Dr. Bamberger state that claimant had little or no use of the hand for tasks in general, such as drinking a cup of coffee, holding a fork, opening a door, and so forth; he did not state that the hand as a whole is essentially useless. On the contrary, when claimant returned to work, Dr. Bamberger did not restrict him to tasks using only the left hand but simply restricted claimant to light-duty work upon his return from surgery.
 {¶ 61} Further, although Dr. Bamberger mentions the absence of the middle finger and the limitations of the index finger in some of his notes and reports, he does not describe the functioning of the thumb, ring finger, or little finger at the time of the application. Moreover, in his notes of September 2002, Dr. Bamberger stated that claimant had a "slight" decrease of his grip strength, which indicates that claimant retained the capacity to grip objects with only a modest decrease in his grip strength.
 {¶ 62} Last, in the report on which the commission relied, Dr. Bamberger does not opine as to the permanency of the restrictions and impairment of the fingers. While the permanency of the middle-finger loss was sufficiently obvious, with no need of a medical opinion on permanency, the complete loss of that finger supports an award of only 30 weeks. The loss of the index finger, based on immobility of joints (if found by the commission) would warrant an award of 35 weeks. However, the Bamberger report on which the commission relied does not support a determination that the claimant had essentially lost the complete function of his right hand.
 {¶ 63} Dr. Bamberger's focus on claimant's work history and right-hand dominance in the April 2002 report, together with his comments regarding claimant's "slight" loss of right-hand grip as of September 2002, combined with the absence of any discussion of the overall functioning of all the digits, makes clear that Dr. Bamberger applied an inappropriate standard for considering an "award" for the loss of a hand. In other words, the magistrate concludes that, given Dr. Bamberger's office notes describing claimant's capacity to use his right hand, and given his focus in the April 2002 report on factors not relevant to whether a worker has sustained the "loss of a hand" under R.C. 4123.57(B), the report cannot constitute some evidence on which the commission could rely. Dr. Bamberger's conclusion that claimant qualifies for an award for the loss of his hand is not consistent with his findings that claimant has sustained only a "slight" loss of his ability to grip things with his right hand, and the doctor failed to provide, in any of the reports, a description of the functional capacities of the entire hand, including all the digits, that would support the commission's conclusion that claimant lost "100%" of the use of his right hand.
 {¶ 64} In sum, although Dr. Bamberger described a fused joint in the index finger, absence of the middle finger, and a "slight" decrease in grip strength, neither his narrative report nor his office notes set forth sufficient clinical findings to support a loss of use of the hand. The fact that multiple injuries occurred and that multiple surgeries were performed does not establish impairment of function.
 {¶ 65} Second, the magistrate observes that Dr. Bamberger relied on a non-allowed condition of the right ring finger. In the report on which the commission relied, Dr. Bamberger relied in part on the surgery for the right ring finger, fractured in a fight more than a year after the industrial injury. In addition, in his reports of September 2002, Dr. Bamberger again relied on that condition of the ring finger.
 {¶ 66} At oral argument, claimant's counsel argued that the fight may have taken place at work and the fracture could be a work-related injury. The employer argued that claimant told Dr. Koppenhoefer that the injury occurred in a fight with his brother. These factual disputes, however, are not for the court to resolve. If the condition of "displaced fracture, right ring finger" was caused by a new industrial injury or if it resulted from the already recognized industrial injury, the condition would nevertheless have to be allowed in the claim before the commission could rely on it in granting compensation. Until and unless the condition is allowed in a workers' compensation claim, a doctor's report based even in part on the condition cannot constitute some evidence on which the commission may rely. State ex rel. Shields v. Indus. Comm. (1996),74 Ohio St.3d 264; Quarto Mining, supra.
 {¶ 67} As for Dr. Gibson's report, the parties agree that it was merely a file review. Because Dr. Gibson did not examine the claimant, his report stands or falls on the reports of the examining physicians on which it was based. Here, Dr. Gibson appears to have relied primarily if not solely on the reports of Dr. Bamberger. He mentions specific findings but the examination reports containing those findings are not in the record. The medical reports in the record do not document the permanent post-surgical restrictions recited by Dr. Gibson, and, moreover, to the extent he relied on Dr. Bamberger's reports, he does not identify the specific reports on which he relied, making it impossible for the court to determine whether Dr. Gibson relied on reports of Dr. Bamberger that are barred from evidentiary consideration. Thus, Dr. Gibson's report is tainted by the deficiencies in some of Dr. Bamberger's reports insofar as proving loss of a hand is concerned. In sum, there is no report of an examining physician in the record that provides clinical findings on the functional status of the entire hand to support the commission's finding of total loss of use of the hand.
 {¶ 68} Last, the magistrate notes that, at oral argument, claimant argued that the commission did not necessarily award compensation under the provision in R.C. 4123.57(B) setting a specific amount of compensation for the "loss of a hand," but may have granted compensation under the provision that permits the commission, when a claimant has lost two or more fingers by amputation or ankylosis, to award additional compensation for the loss of fingers in situations where the loss of those fingers causes disability greater than the disability that would ordinarily result from the loss of those fingers or loss of their use. The magistrate agrees that, under that provision, the fact that the amputated or immobile fingers were on the dominant hand would be highly relevant, as would the claimant's employment history, because that provision explicitly directs the commission to consider claimant's employment at the time of injury.
 {¶ 69} However, the commission's counsel did not agree with claimant's contention. The commission took the position that its order shows that it was granting compensation under the provision allowing 175 weeks for the "loss of a hand" and that it was not granting "additional" compensation for the loss of "two or more fingers" where that loss causes "greater disability" than usual due to the nature of employment at the time of injury.
 {¶ 70} The magistrate notes that the commission's order does not indicate that it was applying the special provision for the loss of two or more fingers. If the commission intended to award 175 weeks of compensation on the grounds that claimant experienced a greater handicap/disability than normally resulting from the loss of two fingers, it was obliged to say so; it was obliged to state that claimant sustained the loss of two fingers and then to explain why claimant's loss of two fingers caused him greater disability/handicap than ordinarily experienced with a loss of two fingers. See State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. Therefore, even if claimant's argument about the commission's intentions is correct, the order is nonetheless deficient for failing to provide an adequate explanation of the rationale.
 {¶ 71} Based on the foregoing, the magistrate concludes that the commission's award of compensation constituted an abuse of discretion and that this matter must be returned to the commission. The appropriate extent of the writ is subject to debate. However, on consideration of all the arguments presented, the magistrate concludes that a "full writ" ordering the commission to deny the claimant's application would not be appropriate. The language of claimant's application could be viewed as requesting an award for the amputated middle finger and for the index finger with the fused joint. Further, Dr. Gibson's report suggests that there may be reports in the claim file that could support an award, even though those reports are not in the record before this court. Also, to the extent that the commission intended to rely on the "loss of two or more fingers" provision rather than the "loss of a hand" provision, the commission should have the opportunity to correct the Noll deficiencies. Therefore, the magistrate recommends that the court issue a limited writ returning this matter to the commission to vacate the order of the staff hearing officer, to hold a new hearing, and to issue a new order granting or denying the requested compensation under R.C. 4123.57(B).